## In re WILLIAMS et al.

(District Court, W. D. South Carolina. November 10, 1921.)

1. Bankruptcy ⊚⟶415(½)—Hearing of objections to discharge is trial in equity.

Under the Bankruptcy Law (Comp. St. §§ 9585–9656), the hearing of objections to a bankrupt's discharge is in effect a trial in equity.

2. Bankruptcy ⊚⟶415(½)—Hearing of objections to discharge is new suit growing out of conduct or transactions after filing of petition in bankruptcy.

The hearing of objections to a bankrupt's discharge is the beginning of a separate and distinct controversy, or a new suit or action growing out of the conduct and transaction of the bankrupt in connection with his trustee after the filing of his petition in bankruptcy.

3. Bankruptcy ⊚⟶404(1)—Right to discharge not absolute, but dependent on square dealings and honest purposes.

The granting of a discharge is not an absolute right existing at the time of the filing of a petition in bankruptcy, but is dependent on square dealings and honest purpose of the bankrupt, as evidenced by his acts and doings after the filing of his petition.

**4. Bankruptcy ⚖⇒404(1)—Discharge granted, if bankrupt surrenders property fully and shows good faith.**

If the bankrupt shows good faith and honest dealings on his part, surrenders his property fully, and does not conceal or retain any that should be turned over to his trustee, he is entitled to a discharge; but, if he fails to do so, a discharge should be denied.

**5. Bankruptcy ⚖⇒407(1)—Proof of any one of statutory grounds defeats discharge.**

Proof of the commission by the bankrupt of any one of the grounds specified in the Bankruptcy Act is sufficient to deny discharge.

**6. Bankruptcy ⚖⇒415(2)—Special commissioner cannot dismiss objections to discharge.**

A special commissioner, to whom the issues raised by objections to a bankrupt's application for discharge were referred to hear testimony and report it to the court, with his conclusions of fact and recommendations thereon, had no jurisdiction to dismiss the specifications of objection, because not served or improperly verified.

**7. Bankruptcy ⚖⇒409(1)—Matters to be shown respecting books of account to defeat discharge stated.**

To sustain objections to a discharge in bankruptcy because of the destruction, etc., of books of account, or failure to keep such books, the proof must show that the bankrupts or some one under their directions, with intent to conceal their financial condition, either destroyed, concealed, secreted, falsified, or mutilated their books of account or records, or failed to keep any from which their condition might be ascertained, and the intent is the controlling element.

**8. Bankruptcy ⚖⇒409(1)—Failure to keep book showing goods returned held not to bar discharge.**

When bankrupts kept a sufficient number of books from which their financial condition might be ascertained, their failure to keep a book containing a record of goods returned by customers did not defeat their right to a discharge.

**9. Bankruptcy ⚖⇒408(3)—Property must be concealed from trustee after adjudication to defeat discharge.**

While a concealment of property by a bankrupt prior to the four months' period, when continued through that time and until after adjudication in bankruptcy may defeat a discharge, the concealment must continue and extend into the time when it becomes a concealment from the trustee, and where property conveyed by a bankrupt to his wife had been reconveyed to him before the petition in bankruptcy was filed, and was scheduled and turned over to the trustee, there being no concealment or attempt to conceal property from the trustee, there was no ground for denying a discharge.

**10. Bankruptcy ⚖⇒414(3)—Evidence held to show bankrupt's conveyance to his wife was not made with intent to defraud creditors.**

On objections to bankrupt's application for discharge, evidence *held* to show that his conveyance to his wife of their home, then heavily mortgaged, which was reconveyed by the wife to the husband shortly before bankruptcy, and a few days after a suit was brought to set the conveyance aside, was *not* made with intent to hinder, delay, or defraud creditors.

**11. Bankruptcy ⚖⇒414(3)—Court should find against fraudulent purpose in conveying home to wife, when two inferences possible.**

On objections to the bankrupt's application for discharge, the proof of fraudulent intent on the part of the bankrupt in conveying property to his wife should be clear and convincing, and satisfy the conscience of the court that a positive fraud was intended, and when two inferences may be drawn, one pointing to a guilty or bad intent, and the other consistent with honesty, it is the duty of the court to find in favor of honesty, and the absence of a fraudulent purpose.

---

⚖⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**12. Bankruptcy ☞408(1)—False oath must be made knowingly and with intent to defraud to defeat discharge.**

To defeat a discharge, a false oath made by the bankrupt must have been knowingly and fraudulently made, and if the false oath was due to mistake and was subsequently corrected, no offense was committed warranting the refusal of a discharge.

**13. Bankruptcy ☞414(3)—Evidence held to show bankrupt's testimony as to date of execution of deed not false.**

On objections to bankrupt's application for discharge on ground, among others, that the bankrupt had sworn falsely, evidence *held* to show that a deed from the bankrupt to his wife was executed on the date of the jurat, at about the time testified to by the bankrupt.

**14. Bankruptcy ☞407(5)—Matters to be shown respecting obtaining of credit to defeat discharge stated.**

To defeat a bankrupt's application for discharge on the ground that he obtained credit on materially false statements in writing, it must be shown that the bankrupt obtained money or property on credit, that he did so on a statement of his financial condition, relied on by the creditor, that the statement was in writing and materially false, and made to the creditor or his representative, for the purpose of obtaining credit from such creditor, and that the property was obtained by the bankrupt or some one duly authorized by him.

In Bankruptcy. In the matter of Seaborn Williams and another, doing business as Williams & Gantt, bankrupts. On application for discharge, to which certain creditors filed objections. Discharge granted.

The report of Hunt, Special Commissioner, was as follows:

On the 26th day of July, 1921, his honor, H. H. Watkins, Judge of the Western District of South Carolina, authorized and directed me, as special commissioner, to take the testimony on the issues raised on the specification of objections to the discharge of the above named bankrupts, and report same to the court with all convenient speed, together with my conclusions of fact and recommendations thereon. In conformity thereto, I held a reference at Saluda, S. C.. on the 21st day of September. 1921. The proceeding of said hearing, including testimony introduced, is herewith filed with the court. After the introduction of testimony, the reference was continued to be held at Newberry, S. C., on the 7th day of October, 1921, for the purpose of hearing argument of counsel. By consent, the date of the hearing at Newberry was changed to Thursday, October 6, 1921. The reference was closed on October 6, 1921.

[1-5] Under the Bankruptcy Law (Comp. St. §§ 9585–9656), the hearing of objections to a bankrupt's discharge is. in effect, a trial in equity. It is the beginning of a separate and distinct controversy. It is a new suit, or action, growing out of the conduct and transaction of the bankrupt in connection with his trustee after the filing of his petition in bankruptcy. The granting of a discharge is not an absolute right, existing at the time of the filing of a petition in bankruptcy. It is dependent upon the square dealings and honest purpose of the bankrupt, as evidenced by his acts and doings after the filing of his petition. These conditions cannot be ascertained until after application for a discharge has been made. If the bankrupt shows good faith and honest dealings on his part. surrenders his property fully, and does not conceal or retain any part thereof that should be turned over to his trustee, he is entitled to his discharge. If he fails to do so, his discharge should be denied.

In the case at bar. the bankrupts have filed their petition for a discharge in bankruptcy. Certain creditors have filed their specifications of objection thereto. The Bankruptcy Act names six specific cases in which a bankrupt may be refused a discharge. Proof of commission of any one is sufficient to deny

the discharge. The objecting creditors charge and specify four of the six cases named in the act. Some of the specifications, however, are subdivided for the purpose of alleging specific acts thereunder.

[6] At the hearing at Saluda, S. C., on September 21st, the bankrupts' attorneys moved to dismiss the specifications of objection on the grounds that the specifications were not served on the bankrupts, and because the specifications were improperly verified. The motion, and ruling thereon, is fully set out on pages 1 and 2 in the proceeding of the hearing, hereto attached. I held that, as special commissioner, I had no authority to pass on the objections to the specifications; that my authority was limited to the specifications as referred to me by the court. On the ground of lack of jurisdiction, I declined to rule on the questions raised, holding that those questions should be passed upon by the judge of the District Court and not by a special commissioner appointed to hear testimony thereon. Collier on Bankruptcy (10th Ed.) pp. 327 and 328, and cited authorities thereunder, says:

"Amendments to correct error due to mistakes or accident are usually allowed, if asked for at any time prior to the submission of the case. It has been held that under certain circumstances they may be amended to conform to the proofs. Application should be made to the judge; a referee having no power to grant such amendments. * * * Amendments are discretionary with the District Court, and are reviewable in the Circuit Court of Appeals under section 24b of the Bankruptcy Act." In re Wolfensohn, 5 Am. Bankr. Rep. 60. In re Kaiser (D. C.) 99 Fed. 689. In re Peck (D. C.) 120 Fed. 972. In re Hixon (D. C.) 93 Fed. 440.

If a referee, or special commissioner, has no authority to allow an amendment to specifications, he certainly has no authority to go further and dismiss them, and thereby destroy the subject-matter on which his "taking of testimony" depends. Any ruling thereon would have been ultra vires.

By agreement of counsel, the attorneys for the objecting creditors offered in evidence the original transcript of evidence taken before Hon. S. M. Smith, Referee. The evidence consisted of 119 pages of typewritten testimony, books, vouchers, and other documentary evidence. There was no testimony introduced tending to show individual misconduct on the part of the bankrupt Grover Gantt. It appears that the bankrupt Seaborn Williams was the only witness who testified before the referee. His testimony consumed 116 typewritten pages. His examination was direct, thorough, and piercing on all matters and things directly or remotely connected with his bankrupt estate. The first and second specifications of objection are:

"(1) In that the said bankrupts, with intent to conceal their financial condition, destroyed, concealed, or failed to keep books of account, daybooks, cashbooks, or records from which such condition might be ascertained."

"(2) In that said bankrupts failed to keep a daybook, or a book containing a record of goods returned by customers of the said bankrupts."

[7, 8] The authorities hold that, in order to sustain the above objections, the proof must show that (1) the act complained of was done by the bankrupts or some one acting under their directions; (2) with intent to conceal their financial condition; and (3) the act must consist of either destruction, concealment, secreting, falsifying and mutilating; or (4) failure to keep books of accounts or records from which the bankrupt's condition might be ascertained. In order to bar the discharge, the objecting creditors must prove, by a clear preponderance of the evidence, that one or more of the acts complained of has been committed in the manner and for the purpose above stated. The intent of the bankrupt is the controlling element in these charges. There is a distinction between the proof required in criminal and civil actions in charges of this nature. The distinction is drawn in the case of In re Marcus & Scherr (D. C.) 192 Fed. 743, 27 Am. Bankr. Rep. 164, affirmed 203 Fed. 29, 121 C. C. A. 393, 30 Am. Bankr. Rep. 176. The acts objected to must have been done with intent to conceal their financial condition. The mere failure to keep books is not enough to sustain the charges, unless it was done with intent to conceal the bankrupts' financial condition.

In the case at bar, the bankrupts kept a full set of books, which appear to be fully adequate to the requirements of the amount of business that they

were transacting. The books were unusually neatly kept, and seem to be sufficiently indexed as to furnish a speedy reference to any department of their business. The bankrupts did not keep a separate book "containing a record of goods returned by customers," as objected to in specifications. There is no law, rule, or custom of merchants that requires the keeping of such a book, except, perhaps, in the case of wholesale or retail merchants who sell goods on approval. The failure to keep such a book does not make the bankrupts amenable to the law, nor is it sufficient evidence to suggest that it was done with intent to conceal their financial condition from their creditors. When a sufficient number of books are intelligently kept and produced in evidence, a failure to keep a book showing goods returned by customers is not sufficient to bar a discharge. I find that the bankrupts kept a sufficient number of books from which their financial condition might be ascertained. I therefore conclude that specifications 1 and 2 have not been sustained.

The first part of specification 3 is as follows:

"In that Seaborn Williams, subsequent to the first day of the four months immediately preceding the filing of the petition in bankruptcy herein, transferred, conveyed, and made over to his wife, Bertha Williams, same being a voluntary conveyance, his house and lot in the town of Saluda, being all that lot of land containing 1⅝ acres, more or less, with the improvements situated thereon and bounded as follows, to wit: North by Travis avenue and lands of James Sadler; east by T. D. Fulmer; south by lands now or formerly belonging to L. A. Denny and Travis avenue; and west by Mose Graham and James Sadler—with the intent to hinder, delay, and defraud his creditors."

The bankrupt Seaborn Williams is charged with conveying his house and lot in the town of Saluda, S. C., to his wife, Bertha Williams, with intent to hinder, delay, and defraud his creditors. In order that there may be no confusion as to the dates of the different transactions and events in connection with the house and lot in question, it is best to refer to the testimony in connection therewith:

March 5, 1920. Deed from B. B. Hare to Seaborn Williams. Consideration expressed, $1,500. Recorded March 8, 1920.

Between May 23 and October 1, 1920. Dwelling house built on lot. Estimated cost $7,000. House and lot mortgaged to the Planters' National Bank of Saluda to secure about $4,000.

October 1, 1920. Deed from Seaborn Williams to Bertha Williams. Consideration expressed, $6,000.

January 8, 1921. Deed from Seaborn Williams to Bertha Williams recorded.

February 18, 1921. House and lot returned for taxation in name of Mrs. Seaborn Williams.

April 7, 1921. Summons and complaint in state court to set aside deed from Seaborn Williams to Bertha Williams served.

April 15, 1921. Deed from Bertha Williams to Seaborn Williams. Consideration expressed, $3,000 "and the assumption of any lien or encumbrances and charges on or against the property herein described."

April 18, 1921. Adjudged a bankrupt in United States District Court.

April 20, 1921. Answers served in case in state court.

April 26, 1921. M. T. Pitts qualified as trustee of the bankrupt estate.

May 2, 1921. Seaborn Williams returned and scheduled house and lot to M. T. Pitts, trustee. Valuation, $6,000.

May 23, 1921. House and lot appraised and valued at $4,750.

July 5, 1921. House and lot sold by trustee in bankruptcy for $4,500.

July 5, 1921. Report on sale by M. T. Pitts, trustee.

July 5, 1921. Order confirming sale passed by Hon. S. M. Smith, Referee.

Before entering into a detailed examination of the facts of the proceeding, it is well to have a clear understanding as to the line of demarcation between offenses committed against creditors before bankruptcy and offenses against a trustee during and after bankruptcy. Under the Bankruptcy Act, a party may be adjudged an involuntary bankrupt when he has "conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, any part of his property with intent to hinder, delay or defraud his creditors, or any of them." That is such an offense against creditors as will warrant him

being adjudged a bankrupt. After adjudication, however, he becomes subject to new duties and requirements. The interest, rights, and remedies of his creditors are centered and lodged in his trustee. It is then incumbent on the bankrupt to make an honest schedule and disclosure of all of his property to his trustee. He must not withhold or conceal any part thereof. In case he fails to schedule all of his property, or otherwise acts dishonorably towards his trustee, he should be denied his discharge in bankruptcy. If he schedules and turns over all of his property to his trustee, and does not conceal or withhold any part thereof, he has fully complied with the law and is entitled to his discharge. Mr. Collier, in his book on Bankruptcy (10th Ed., p. 336), correctly states what acts are necessary to constitute concealment as a bar to a discharge:

"To constitute concealment an objection to a discharge, it must be (1) by the bankrupt, while a bankrupt or after his discharge, in other words, after the filing of the petition, and (2) from his trustee, (3) of property belonging to the estate in bankruptcy, and (4) such concealment must be 'knowingly and fraudulently' done. The latter is the most important of these elements, and, without clear proof sustaining it, the specification must be dismissed."

Upon examination and comparison of the dates of the different transactions, it is clear that on the date Seaborn Williams was adjudged a bankrupt, that is to say, on April 18, 1921, the title to the house and lot vested in him. On May 2. 1921, he returned and scheduled the house and lot to his trustee. The property was thereafter sold by his trustee for the benefit of his creditors.

[9] It is unquestionably the law that a concealment prior to the four months period and continued through that time, and until the party had been adjudged a bankrupt, is a "continuing concealment." The "concealment," however, must continue and extend into the time when it becomes a concealment "from his trustee." Otherwise, the doctrine of "continuing concealment" will not apply. The following selected authorities evidence the holding of courts on questions where a concealment of property from a trustee is involved:

"The concealment must have been a concealment from the trustee." 3 Remington on Bankruptcy, art. 2499.

"An examination of the foregoing cases shows clearly that there must be a concealment of assets from the trustee. A mere attempt to hinder and delay creditors is not sufficient to support an objection to a discharge." In re Jacobs (D. C.) 144 Fed. 870.

"The concealment, in order to effect a bar of a discharge, must have been perpetrated while the debtor was a bankrupt, or after his discharge." 3 Remington on Bankruptcy, art. 2497.

"A fraudulent concealment of property, such as will justify a refusal of discharge, cannot be predicated upon acts committed prior to the adjudication of bankruptcy; but, if a concealment of goods or money then initiated with intent to defraud creditors is continued after the bankruptcy, it is a concealment from the trustee within the statute." 7 Corpus Juris, p. 383; In re Jacobs & Verstandig, 147 Fed. 797.

"The burden rests upon a creditor to establish by convincing proof that a bankrupt, since his adjudication, has concealed property belonging to his estate from his trustee, and that the concealment was knowingly and fraudulently made, to defeat his right to a discharge on that ground. * * * To prevent the discharge, property belonging to the bankrupt must be fraudulently concealed from his trustee." In re Fitchard (D. C.) 103 Fed. 742.

"It is necessary to show that the concealment was of property to which the trustee is entitled, and it must have been made knowingly and fraudulently by the bankrupts while such; that is, after they were adjudicated bankrupts." In re Jacobs & Verstandig (D. C.) 147 Fed. 801.

The case of In re James, 181 Fed. 476, 104 C. C. A. 224, appears at first reading to controvert the law as stated in the authorities and decisions hereinbefore cited. Neither the syllabus of the case nor the delivery of the Circuit Judge makes it clear that the "concealment" in question was continued until after the date of adjudication in bankruptcy. It leaves a distinct impression

that the court intended to hold that the prohibited four months period, and not the date of adjudication in bankruptcy, was the fixed time when the offense against the trustee was committed. A reference to the facts in that case, as set out in 181 Fed. on pages 476, 477, 104 C. C. A. 224, 225, will show that the "concealment" continued until after adjudication and thereby became a concealment from the trustee. The bankrupt, James, admitted that he had concealed some of his property prior to the four months period, and challenged the jurisdiction of the court on the ground that it had not been taken or concealed "within four months next preceding February 28, 1908" (the date of creditors' petition). The court invoked the doctrine of "continuing concealment," and James was adjudged an involuntary bankrupt. While the statement of facts does not say in words that the concealment was continued until his adjudication, the facts stated therein can lead to no other conclusion. He admitted the concealment prior to the four months period, and.it further appears from the stated facts that some of the goods were stolen from their hiding place without his knowledge or consent. By his misconduct and illegal act he had placed property justly belonging to his trustee beyond the reach of the court. It is evident that he did not schedule the prior concealed goods. He could not have turned over to his trustee the property that was stolen from him during its concealment. While the language of the judge is somewhat ambiguous, and susceptible to more than one interpretation, yet, if taken in connection with the facts in that case, it is clear that when he held that "it is undisputed that the concealment continued until within the four months period, with the consent and acquiescence of the petitioner, and for a fraudulent purpose, thus bringing this case clearly within the purview of the statutes"; that he had in mind that the concealment was continued to the date of adjudication in bankruptcy, and was therefore from his trustee. That case is cited in a footnote in Remington on Bankruptcy on the same page (2380) that sets out the following principle of law:

"In so far as fraudulently transferred or concealed or removed property may be the subject of fraudulent and knowing 'concealment' of property belonging to the estate, mentioned as the first ground for barring discharge, it is obvious that the original fraudulent transfer or removal or initial concealment may have occurred more than four months before the bankruptcy, so long as the property is still recoverable by the trustee and the concealment of it continues after the bankruptcy, the fraudulent transfer itself not being the ground of opposition but constituting the property involved, property 'belonging to the estate,' the concealment of which constitutes the real bar to the discharge. In such cases, however, the property must be shown to be still recoverable, else concealment of it is not concealment 'from the trustee' of 'property belonging to the estate.'"

It is scarcely probable that Mr. Remington would have cited a case that is in direct conflict with a principle of law set out and advocated by him.

As the bankrupt Seaborn Williams had title to the house and lot, and scheduled and turned it over to his trustee for the benefit of his creditors, I conclude that he did not conceal, or attempt to conceal, said property from his trustee, and, irrespective of his motive, he did not commit any offense amenable to the law.

[10] I deem it unnecessary, so far as my findings and conclusions are concerned, to continue the discussion further, as I have held that the concealment, if any, did not continue into the period of bankruptcy, and therefore the bankrupt did not commit any offense against his trustee. However, as the decision in this case must be grounded to a great extent upon the honest purposes and square dealings of the bankrupt, and as his conduct in one instance will have a reflex influence on deciding his motives in other transactions, I feel that both the creditors and the bankrupt are entitled to a positive finding of the court on all questions where integrity and honesty of purpose are involved, irrespective of technicalities or the rules of law. To leave the question of the bona fides of the conveyance from the bankrupt to his wife unanswered would leave that transaction susceptible to two interpretations, and may subject the bankrupt to the criticism of the legal maxim, "falsus in uno falsus in omnibus."

The testimony shows that the bankrupt Seaborn Williams moved to Saluda, S. C., from Wagner, Aiken county, S. C., where he had been employed as a bookkeeper by J. W. Lybrand, a merchant. It appears that he had been in the employ of Mr. Lybrand for 17 or 18 years. Williams stated in his testimony that, when he moved to Saluda, it was impossible for him to rent a dwelling house for himself and family; that it was not his purpose to build at that time; that he rented three rooms in the home of Hon. B. B. Hare, of Saluda, S. C., in which he and his family resided until he had bought a lot and built a house thereon; that he borrowed money from the Bank of Wagner and the Planters' National Bank of Saluda; that before the house was fully finished and completed in its interior he conveyed same to his wife, Bertha Williams. The conveyance was made on October 1, 1920. When the conveyance was made, there was a mortgage on same to secure an indebtedness of about $4,000, and claims for labor and material amounted to about $1,000. At the time of conveyance, Williams owned very little equity in the premises over and above his indebtedness for same. When the premises was sold by the trustee it brought $4,500, which was less than the debts therefor at the time of the conveyance to his wife. The deed was not recorded until January. Williams testified that, as the Planters' National Bank held the mortgage that was to be renewed in January, he left it with the bank until the renewal date. The deed was recorded January 8, 1921. On April 7th certain creditors commenced an action in the state court to have the deed set aside on the ground of fraud. On April 15th Mrs. Williams conveyed the premises to her husband, Seaborn Williams. On April 18, 1921, Seaborn Williams was adjudged a bankrupt, and on April 26th M. T. Pitts qualified as trustee of the bankrupt estate. On May 2d Williams scheduled and turned over the house and lot to his trustee. On May 23d the premises were appraised at $4,750. On July 5th the house and lot was sold by the trustee in bankruptcy at the price of $4,500.

What was the motive and intention of Williams at the time he conveyed the premises to his wife in October, 1920? The testimony in reference to the house and lot may be found on pages 3, 5, 6, 7, 8, 34, 35, 79, 81, 82, 90, 91, 92, 93, and perhaps others. The testimony should be taken and construed as a whole. Williams testified that when he made the deed to his wife in October, he thought it was all right; that he did not convey the property to protect himself against his creditors, but to give his wife a home. In reply to the question as to why he conveyed to his wife, he stated (page 83): "Because she had been working on there so hard and wanted a home, and I said, 'If I get where I can, I will make you a title,' and I deeded it to her." The testimony on this question, taken as a whole, indicates that Williams at that time did not contemplate a business failure, or anticipate being adjudged a bankrupt. It was October, a season of the year when merchants are hopeful of a good trade and profitable business during the coming fall and winter months. There is, however, a portion of the testimony, if taken separate and apart from the other evidence in the case, would be damaging to the cause of the bankrupt. I refer to the answer by Williams to the question: "For whose benefit did you make the conveyance? Why did you convey the land to your wife? A. Just like any one else does; for the same reason, I guess." A number of times during his testimony he stated positively that the conveyance was not for the purpose of defrauding his creditors, but for the purpose of giving his wife a home.

[11] The answer to the question referred to is susceptible to two interpretations: (1) To protect himself against his creditors; or (2) to provide a home for his wife and family, in case of future financial trouble, not at that time anticipated. The conveyance of the home to the wife is neither unusual nor indicative of a dishonest motive. The proof of a fraudulent intent should be clear and beyond the realm of speculation or suspicion. The proof should be convincing and should satisfy the conscience of the court that a positive fraud was intended. When two inferences may be drawn, the one pointing to a guilty or bad intent, and the other consistent with honesty and the absence of fraud and deception, it is the duty of the court to find in favor of honesty and

the absence of a fraudulent purpose. In re Brown (D. C.) 199 Fed. 356, 29 Am. Bankr. Rep. 73.

The pleadings in the state court, in the case of American Wholesale Corporation (Baltimore Bargain House), plaintiff, v. Seaborn Williams and Bertha Williams, defendants, are in evidence before the court. This was an action to set aside and cancel the deed of conveyance to the house and lot in Saluda by Seaborn Williams to his wife, Bertha Williams, dated October 1, 1920, and recorded January 8, 1921. The complaint alleges a fraudulent conveyance, and prays that the deed "be set aside and canceled and that the property therein described be subjected to the satisfaction of the plaintiff's judgment, to be obtained in the action in Saluda county, S. C., referred to above, with interest and costs, and a reasonable fee to plaintiff's attorneys, and for such other and further relief as equity and justice of the case may demand." The summons and complaint was served on defendants April 7, 1921. The answer of the defendant Mrs. Bertha Williams alleges, in part:

"(1) That for the purposes of this action she admits that, in so far as the creditors of her codefendant, Seaborn Williams, and of the firm of Williams & Gantt, of which firm Seaborn Williams, codefendant herein, is a member, are concerned, that the deed of conveyance, dated October 1, 1920 and recorded at Saluda, South Carolina, in Deed Book 21, on page 435, which is set out and described in the complaint of the plaintiff herein, is voluntary. That there was and is ample and sufficient valuable and other considerations moving from this defendant to her codefendant herein, Seaborn Williams, to justify and sustain the said deed in a legal sense. However, this defendant does not now and it has never been her purpose or intention to become involved in any transaction of which it might be charged that it was unfair, or not open and aboveboard, and entirely beyond suspicion of any advantage for this defendant over any creditors of Seaborn Williams individually or of the firm of Williams and Gantt, or any other person.

"(2) That heretofore, and before the commencement of this action, this defendant by and through her attorney offered to reconvey the property described to Seaborn Williams, her codefendant, and now, in order to restore the statu quo, so far as the conveyance of Seaborn Williams to this defendant is concerned, of the property set out and described in the complaint of the plaintiff herein, this defendant has this day reconveyed in fee to Seaborn Williams, his heirs and assigns, forever, the said property, subject to liens and incumbrances with which the said property is charged, and were charged when the property was conveyed to this defendant."

The answer of the defendant Seaborn Williams alleges, in part:

"(1) That his codefendant, Mrs. Bertha Williams, the wife of this defendant, has this day, in accordance with her purpose and intention heretofore declared, reconveyed to this defendant in fee the real property set out and described in the complaint of the plaintiff herein, and this said house and lot is now the property of this defendant in fee, subject to the liens and incumbrances with which the same is charged. That there was and is ample and sufficient valuable and other considerations moving from Mrs. Bertha Williams to this defendant to justify and sustain the said deed in a legal sense, but this defendant does not now and it has never been his purpose or intention to become involved in any transaction in which it might be truthfully charged that he was unfair, and not open and aboveboard, and entirely beyond the suspicion of seeking any advantage over any of the creditors of the firm of Williams & Gantt.

"(2) That the property described in the complaint of the plaintiff herein is subject to a mortgage owned by the Planters' National Bank of Saluda, South Carolina, dated January 4, 1921, for the full and just sum of four thousand one hundred seventy-five and $31/100$ ($4,175.31) dollars, which mortgage is of record in the office of the clerk of court of Saluda county, in Book 25, at page 223, and, as this defendant is informed and believes, has been placed in the hands of the attorneys for the bank for the protection of the bank's interest. That there are likewise other amounts due for labor and material used in the construction of this house, all of which constitute a charge against the said property."

The above action in the state court is referred to herein, because it is a part of the evidence in this case. The action and allegations therein challenged the bona fides of the conveyance by Williams to his wife. The plaintiff positively and vigorously asserted that the conveyance was fraudulently made with the intent to hinder, delay, impede, and defraud the plaintiff and other creditors; whereas, the defendants, with equal vigor and positiveness, denied the charges and allegations, and stated that in order to restore the statu quo of the property, a conveyance had been made from Mrs. Williams to her husband. The deed from Williams to his wife was made on the 1st day of October, 1920. It was recorded on January 8, 1921. The deed from Mrs. Williams to her husband was made on April 15, 1921. Seaborn Williams was adjudged a bankrupt on April 18, 1921. M. T. Pitts qualified as trustee on April 26th, and on May 2d Williams scheduled the house and lot to his trustee and turned it over for the benefit of all his creditors. The property was sold by the truste; .on July 5th, and the order confirming report on sales was passed by Hon. S. M. Smith, Referee, on July 5, 1921.

It appears in the testimony that some of the creditors of Williams & Gantt met in Columbia on February 15, 1921. On March 8, 1921, a letter was sent to the creditors of said firm, of which the following is a part:

"Upon the information obtained at this meeting, it was decided to recommend the acceptance of 50 cents on the dollar as in full settlement of the obligations of these people and appoint a committee to represent the creditors, which was to assume charge and control of the business until settlement was effected. * * * We understand that some of the creditors have been advised that Mr. Williams has recently conveyed some real estate, to wit, a house and lot in the town of Saluda, S. C., to his wife and they question the bona fides of this transaction. We have looked into this matter for ourselves, and from what we know to be reliable sources the following is a true statement affecting this transaction: Mr. Williams bought a lot in Saluda, consisting of about one acre of land, which he paid for from a part of the proceeds derived from the sale of land he owned in Aiken county. Mr. Williams then borrowed from the Planters' National Bank, of Saluda, South Carolina, funds which he used in the erection of a dwelling house on this lot. He mortgaged the house and lot to secure these funds, and this mortgage is still outstanding. When the dwelling was completed, he conveyed it to his wife, subject to the incumbrances thereon. It is our candid opinion that, if the property were put up and sold, it would not bring more than the mortgage indebtedness, and may not bring that amount. It was a matter of comment at the creditors' meeting in Columbia, by many of the men present who are more or less frequently involved in proceedings of this kind, that the showing made by Messrs. Williams & Gantt was clean and entirely satisfactory. In fact, the largest creditor of the firm took occasion to say publicly that he had never attended a meeting that was more satisfactory from this point of view than the present one."

The letter does not state the names of the creditors present at the meeting, and is signed by "W. B. Oliver, T. I. Swygert, Committee of Creditors." After the conclusion of the letter, and below the signatures of Oliver and Swygert, appears the following:

"I was not present at the creditors' meeting in Columbia, South Carolina, and referred to in this letter above, but upon the information I have as to what occurred there, and as to all other matters stated in this letter, I fully concur.                                                                    M. T. Pitts,

"Committee of Creditors."

Mr. Pitts is a resident of the town of Saluda. He is president of the Planters' National Bank of Saluda, S. C. He is the trustee in bankruptcy referred to in this proceeding. He resided in the same town with the bankrupts, and was evidently familiar with their moral and financial habits and customs. He states that he was not present at the creditors' meeting in Columbia, "but upon the information I have as to what occurred there, and as to all other matters stated in this letter, I fully concur." Mr. Pitts is a gentleman of such high character and unquestioned integrity that any statement or "concurrence" from him should be conclusive in any court.

Because of the voluminous record in this case, it is impracticable to name and recite each specific act or word of the bankrupt, and other evidence, that lead to the conclusion that the conveyance by Seaborn Williams to his wife on October 1, 1920, was a bona fide transaction, and was not done with intent to hinder, delay, or defraud his creditors. There is some testimony in the case that, if taken and construed separate and apart from the whole, would lead to a damaging and adverse conclusion against the bankrupt; but the evidence, examined and construed in its entirety, forces the conviction that the conveyance was not made with an illegal or fraudulent intent.

Specification 3 also alleges:

"And also further, in that the bankrupts, Williams & Gantt, subsequent to the first day of the four months immediately preceding the filing of the petition in bankruptcy, transferred, removed, or concealed. or permitted to be removed. destroyed. or concealed. over eight thousand dollars worth of stock in trade and goods of the said firm of Williams & Gantt, with intent to hinder, delay, and defraud the creditors of the said Williams & Gantt, and also in that the bankrupts, Williams & Gantt. subsequent to the first day of the four months immediately preceding the filing of the petition in bankruptcy, transferred, removed, or concealed a portion of the stock in trade and goods of the said firm of Williams & Gantt. with intent to hinder, delay, and defraud the creditors of the said Williams & Gantt, and also that the said bankrupts, Williams & Gantt, failed to turn over to the trustee in bankruptcy over five thousand dollars worth of goods belonging to the firm of Williams & Gantt."

The general rules of sufficiency of evidence hereinbefore referred to are applicable to above allegations. The acts complained of must have been done knowingly, and with the intent to hinder, delay, and defraud their creditors. The proof must be strict and convincing. The allegations bring in question the good faith, honesty, and fair dealings of the bankrupts in reference to their stock of goods and merchandise. The testimony and evidence in connection therewith is so interwoven and intermingled in the 119 pages of typewritten evidence, books, and other documents that to attempt to specify and itemize the separate facts and figures upon which a conclusion is grounded would produce an unnecessary voluminous report, and perhaps torture the patience of the court. In considering and weighing the testimony in reference to these allegations, I have kept in mind that part of the law that requires a bankrupt, in case of an apparent shortage of assets in his possession, to reasonably account for such shortage, or reasonably explain his inability to do so. Seigel v. Cartel, 164 Fed. 691, 90 C. C. A. 512. Also, where certain acts, facts, and figures are susceptible to two interpretations, the one pointing to a dishonest and fraudulent motive, and the other consistent with square dealings and honesty of purpose, the latter intent should prevail in the mind of the court. Upon a close examination and a detailed inspection of the facts and figures offered in evidence to sustain these allegations, I fail to find sufficient proof to sustain them, and therefore conclude that the evidence produced is not sufficient to bar the discharge.

Specification 4 is as follows:

"(4) In that the said Seaborn Williams committed offenses punishable by imprisonment as provided in the Bankruptcy Law, to wit: Made a false oath on his examination as a bankrupt, to wit, said oath being administered by an officer competent to administer the same, to wit, S. M. Smith, Referee in Bankruptcy, as follows: (a) That Williams & Gantt were worth net $1,360 on the 1st of January, 1921. (b) We had instructions to come back home and to start to operating under the agreement made in Columbia on February 15, 1921. (c) Seaborn Williams stated in one place in his examination as a bankrupt that he did not know whether or not he had made a statement as a basis of credit after he came to Saluda, and in another place stated that he had made a statement as such basis of credit. (d) Seaborn Williams stated that Williams & Gantt were worth $8,000 or $10,000 net the 1st of March, 1920. (e) In that said Seaborn Williams testified as follows in answer to a question: 'Question. How was it that you had a net worth of $1,360 on the 1st of January? Answer. We had already lost what we had put in the business.' (f) That the said Seaborn Williams made false statements in reference to the

286 F.—10

transfer by him of his property, to wit, a house and lot in the town of Saluda, to his wife, Bertha Williams, in that he alleged that said conveyance was made in the fall of 1920, when really it was made in 1921."

[12] In order to make the above specification and allegations effective as against the granting of a discharge, it is necessary to prove that the false oath was "knowingly and fraudulently" made. If a false oath was due to a mistake, and the erroneous statement subsequently corrected by the bankrupt, there was no offense committed that would warrant a refusal of the discharge. In re Doyle (D. C.) 199 Fed. 247, 29 Am. Bankr. Rep. 102. The bankrupt must have known that the statements were false when uttered, and they must have been made with intent to deceive and defraud. Considering the entire evidence, and upon a close examination and comparison of the testimony as a whole, there is not sufficient evidence to sustain the specification and allegations thereunder. I therefore conclude that the bankrupt Seaborn Williams has not committed offenses punishable by imprisonment as provided in the Bankruptcy Law, to wit, made a false oath on his examination as a bankrupt.

Specification 5 is as follows:

"In that said Williams stated that he made a deed of conveyance to his wife, Bertha Williams, of a house and lot in the town of Saluda, which said conveyance was kept off the records, and thereby deceived and misled the creditors of the firm of Williams & Gantt."

Subdivision "f," in specification 4, may be considered more in detail in connection with the specification under consideration. Subdivision "f" is as follows:

"That the said Seaborn Williams made false statements in reference to the transfer by him of his property, to wit, a house and lot in the town of Saluda, to his wife, Bertha Williams, in that he alleged that said conveyance was made in the fall of 1920, when really it was made in 1921."

[13] The deed in question is in evidence and before the court. It is dated the 1st day of October, 1920. It was witnessed by B. B. Hare and Grover Gantt. The probate was executed and sworn to before B. B. Hare as a notary public. Mr. Hare certified as a notary public that the probate was executed and sworn to before him on the 1st day of October, 1920. Mr. Hare is a member of the Saluda bar, and is a gentleman of the purest motives and highest integrity. His name, signed to the jurat as of "October 1, 1920," is conclusive to my mind that both the deed and probate were executed on that date. The revenue stamps affixed to said deed are canceled "10/1/20." It was admitted that the deed was not recorded until January 8, 1921, but there is not sufficient evidence to prove that creditors were deceived and misled thereby.

Specification 6 is as follows:

"That the said Williams & Gantt obtained goods and credit upon materially false statements in writing as to the worth and financial standing of the firm of Williams & Gantt and their representatives."

[14] The authorities hold that the creditor alleging this objection must prove that the bankrupt (1) obtained money or property on credit; that he did so on (2) a statement of his financial condition, relied on by the creditor; that such statement was (3) in writing; that it was (4) materially false; and (5) that it was made to the creditor or his representative, (6) for the purpose of obtaining credit from such creditor; and that the obtaining of property must have been (7) by the bankrupt or by some one duly authorized by him. This specification has not been proven or established. There was no financial statement in writing, signed by the bankrupt, introduced in evidence, on which credit was extended. There was no proof that any creditor relied on such a statement as a basis of credit, or that such statement, if made, was materially false. The testimony fails to disclose any fact on which this objection may be sustained.

The conclusions expressed herein have been reached after a painstaking, laborious, and thorough examination and inspection of the entire testimony in this case. Books and court decisions have been referred to, in order to fairly and equitably measure the facts by the rules that the law lays down. There

is not sufficient evidence to sustain the specifications herein, and I therefore recommend that the petition for a discharge in bankruptcy be granted.

B. W. Crouch and C. J. Ramage, both of Saluda, S. C., and W. L. Daniel, of Greenwood, S. C., for objecting creditors.

Able, Blease & Griffith and B. B. Hare, all of Saluda, S. C., for bankrupts.

WATKINS, District Judge. The above-named bankrupts having filed their petition for a discharge in bankruptcy, certain creditors, through their counsel, appeared and filed objections to such discharge. The numerous specifications of objections need not be recapitulated in this opinion. The issues raised by the said petition for discharge and specifications of objections thereto were by me referred to I. H. Hunt, Esq., of Newberry, S. C., as special commissioner, to take the testimony on such issues as are raised therein, and report the same to this court with all convenient speed, together with his conclusions of fact and his recommendations thereon. The said special commissioner, after hearing testimony and arguments of counsel, has filed an unusually elaborate, thorough, and able report, wherein he has considered and discussed at length both the law of the case and the facts in issue.

I have carefully gone over the report and the testimony, which, including the exhibits submitted, was quite voluminous. The thorough and comprehensive briefs submitted by counsel for objecting creditors were entitled to and have received extended and careful consideration by the court, but I am unable to find in any of the objections assigned sufficient reason to deny the discharge. Both the findings of fact and conclusions of law of the special commissioner are approved and confirmed. The report of the special commissioner is so thorough and convincing that no useful purpose could be served by an additional discussion in this opinion of the issues involved, further than to add to the authorities cited the case of Sherwood Shoe Co. et al. v. Wix, 240 Fed. 692, 153 C. C. A. 490. That case arose in this district.

The referee filed an elaborate opinion, recommending the denial of the discharge, because of the intention of the bankrupt to conceal his financial condition by failure to keep books of account or records from which such condition might be ascertained. The testimony revealed a much stronger case against the bankrupt upon this ground than in the instant case, but the report of the referee was disapproved by Judge Johnson, and the discharge allowed. In re Wix (D. C.) 236 Fed. 262. Affirming this opinion, the Circuit Court of Appeals said:

"Analyzing this statutory provision, it is clear that its sole purpose is to condemn a design on the part of a bankrupt to conceal his financial condition by either (a) destroying his books of accounts or records, or (b) concealing them, or (c) failing to keep them. It cannot be construed to require any particular system of bookkeeping, *nor can it be construed to require the keeping of books at all.* (Italics ours.) The books kept may be so faulty and deficient as to in fact deceive creditors as to the bankrupt's financial condition, yet. if they have been so kept with no purpose to conceal such condition, the inhibition of this statute does not apply. Congress emphasized this construction when by the amendments of 1903 it struck out the word 'fraudulent' before the word 'intent,' 'true' before the words 'financial condition,'

and the words 'and in contemplation of bankruptcy' following the words 'financial condition.' ''

As indicated above, the report of the special commissioner so conclusively answers and disposes of the specifications of objections as to render it unnecessary and even unwise further to extend the record by an elaborate opinion. It should be added that at the hearing before the special commissioner bankrupts' attorneys moved to dismiss the specifications of objections on the ground that the specifications were not served upon the bankrupts, and because the specifications were improperly verified. These objections, however, were not specially urged before me, and I deem it unnecessary to pass upon them, since the case will be disposed of upon its merits in favor of the bankrupts.

It is conclusive to my mind that the discharge should be granted, and an order will be entered accordingly.